

ENTERED
03/09/2016

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: § | | |
| CHARLES R. SADEN; aka SADEN; fdba § | CASE NO: 10-35051 | |
| POS CARD PROCESSING; dba HEALTH § | | |
| & MEDICAL PLANS; fdba PRECISION § | | |
| PAYMENT COMPANY; dba § | | |
| HOHENSADEN, LLC § | | |
| Debtor(s) § | | |
| § | CHAPTER 7 | |
| ─────────────────────── § | | |
| BRIAN SMITH, *et al* § | | |
| Plaintiff(s) § | | |
| § | | |
| VS. § | ADVERSARY NO. 10-03682 | |
| § | | |
| CHARLES R. SADEN § | | |
| Defendant(s) § | | |

**MEMORANDUM OPINION**

Brian Smith seeks a summary judgment against Charles Saden that a Texas state court judgment is excepted from discharge under 11 U.S.C. §§ 523 (a)(2), (a)(4), and (a)(6). Partial summary judgment is granted. At least $1,876,233.42 (plus interest at 5% from and after October 1, 2014) of Saden's debt to Smith is excepted from discharge.

**Factual and Procedural Background**

*Trial*

Brian Smith owns Cash Register Sales and Service of Houston, Inc., which does business as CRS, Texas. CRS sells cash registers and "point of sale systems" commonly used in restaurants. Before meeting Smith, Charles Saden worked as a salesman for a company in the business of processing credit card payments. In 1999, Saden contacted Smith and CRS to solicit leads or referrals for customers. From 1999 to 2001 Smith and Saden worked together

exclusively on a customer referral basis. In 2001, Saden resigned and approached Smith about forming a new credit card processing company. (ECF No. 31 at 18).

In 2001, Saden and Smith formed and became co-owners in POS Card Processing, Inc. Smith contributed $10,000.00 to enable POS to obtain an affiliation with National Processing, allowing POS to enter the credit card processing market. (*Id.*) Saden did not initially contribute cash to fund POS. Smith testified that he did not mind being the only one to contribute because he knew that Saden was unemployed. Smith and Saden agreed that Saden would conduct the day to day operations of POS. Smith testified that he intended to be a silent partner, while Saden operated POS. Smith intended to generate business for POS by referring customers of CRS who would need credit card processing services to POS. Smith believed that Saden brought valuable experience and knowledge in the credit and processing business to POS. (*Id.* at 19).

POS generated revenue by receiving a fraction of the fees that the bank charged on each card transaction. POS received its income initially by check, and later by direct deposit into a bank account. Saden and Smith each owned a 50% share of POS, and both were directors of the company. The POS bylaws require the board to act unanimously. Saden and Smith agreed, in writing, that "until further action of the Directors, no Director of the Corporation shall receive a salary in such capacity" and that the directors and officers were authorized to hire and supervise employees and independent contractors to accomplish the goals of the business. (*Id.* at 20). At trial, Saden testified that many of the initial agreements that governed POS were modified by later oral agreements, and that they did not operate the business in accordance with the articles of incorporation and the bylaws. For example, Saden testified that he and Smith orally agreed to pay salaries and to pay Saden all of the profits from the sale of card processing terminals in the first year. Saden and his adult daughter, Charlyn, received salaries from POS. Smith disputes

both of Saden's alleged oral agreements. Smith testified that he believed Charlyn to be working on commission and not for an "exorbitant" salary, a fact he first learned during the course of litigation. (*Id.* at 21).

POS maintained bank account with Klein Bank, which later became Amegy Bank. POS received its share of card processing fees by direct deposit into this bank account. Although Smith testified that from 2001 to September 2008 CRS referred its customers exclusively to POS for services, Saden testified that Smith was not interested and did not participate in the business of POS. Saden testified that CRS did not refer any business to POS, and thus, any business POS had was generated by Saden himself. Feeling so justified, Saden began doing business separately as "Precision Payment Company," engaging in the same type of business as POS. Saden created an additional bank account at Klein Bank in his own name for that purpose. (*Id.* at 22).

After Saden began operating Precision independent of POS, he caused revenue from existing and new POS clients to be deposited into his personal bank account at Klein Bank. At trial, Saden did not deny that he took such actions. Indeed, he conceded that he (i) created fraudulent checks bearing the POS name and his personal checking account number, (ii) diverted money that should have gone to POS's bank account into his own account, (iii) falsified records so it would appear that lesser amounts were being deposited into the POS account from bank agents who processed the credit card transactions, and (iv) failed to inform Smith or lied to him about the amount of money that POS was earning. Additionally, Saden testified that he did not split POS's revenue equally. In 2002, Saden paid himself $63,000.00 and Smith only $10,000.00. Saden blamed Smith for not being aware of his conduct, and argued that despite his conduct, Smith earned more money than he would have under their pre-POS business

arrangement. When Saden was questioned at trial regarding his "skimming off the top" of the POS accounts, he responded, "[t]hey got what they deserved." (*Id.* at 22-24).

In addition to diverting POS revenue to his personal account, Saden sold two separate POS customer account portfolios for substantially more than he deposited into POS accounts. Saden deposited only $53,000.00 from a portfolio sold for $92,000.00, and deposited only $54,000.00 deposited from a portfolio sold for $286,000.00. In July 2008, after Saden failed to respond to a request from Smith for information about the finances of the business, Smith and Saden discussed ending the business. In September 2008, Smith asked for an accounting and Saden provided him with some limited information. However, Smith testified that Saden left out the "source information" that would have indicated which card processor deposited which amounts at which times. (*Id.* at 24-25).

Ultimately, Smith sued Saden for, among other things, breach of contract and breach of fiduciary duty. The case was tried to a jury. At trial, Smith presented the testimony of Bill Shields, an accountant who analyzed the books and records of POS and Precision. Shields testified that between 2002 and 2008, POS had actual revenue of $3.77 million. Additionally, Shields testified that $2.41 million was diverted from POS to Precision. Shields calculated that based on equal revenue sharing, but excluding disputed expenses, Saden owed Smith $941,907.00. Shields stated that $941,907.00 "represents the excess portion of the income that was either received by or directed to the benefit of Saden." (*Id.* at 25-26).

The jury awarded Smith $941,907.00 for breach of contract, $393,093.00 for breach of fiduciary duty, and $941.907 for equitable disgorgements of profits resulting from Saden's breach of fiduciary duty. The trial court rendered judgment in the amount of the jury's award, plus attorney's fees and prejudgment interest. (ECF No. 28-11 at 4-6). The trial court also made

a determination that Saden's conduct constituted fraud, defalcation, and embezzlement while acting and serving in a fiduciary capacity, though there was no jury finding to that effect. (*Id.* at 5).

*Appeal*

Saden appealed from the judgment of the trial court. The court of appeals reversed the trial courts judgment in two respects: (1) any finding of fraud, defalcation, and embezzlement while acting and serving in a fiduciary capacity, and (2) the actual damages awarded for *both* breach of contract and breach of fiduciary duty. The court of appeals remanded the case so that Smith could choose to elect under which cause of action he will seek damages, as the duplicative damages award violated the one-satisfaction rule. The court of appeals did not reverse the equitable disgorgement award because it did not find that it violated the one-satisfaction rule, and Saden did not contest the amount awarded. (ECF No. 31 at 48-49).

On remand, Smith elected to recover under breach of contract. (ECF No. 28-12 at 5). The second final judgment awarded Smith the following amounts:

| Amount | Purpose |
| --- | --- |
| $ 941,907.00 | Actual damages for breach of contract |
| $ 269,153.15 | Prejudgment interest (5% from January 9, 2009 to September 26, 2014) |
| $ 590,173.27 | Reasonable and necessary attorney's fees |
| $ 941,907.00 | Equitable disgorgement for breach of fiduciary duty |
| $ 269,153.15 | Prejudgment interest (5% from January 9, 2009 to September 26, 2014) |
| **Total** | |
| $ 3,012,293.57 | |

The trial court also awarded contingent attorneys' fees of $75,000.00 in the event of an appeal to the court of appeals, and an additional $50,000.00 in the event of a further appeal to the Texas Supreme Court. Saden appealed to the court of appeals but failed to timely file a brief or

adequately respond to notice that the appeal was subject to dismissal.  Consequently, the appeal was dismissed. (ECF No. 28-13 at 2).

On November 19, 2015, Smith filed his amended motion for summary judgment in this adversary proceeding seeking that the full amount of the trial courts second final judgment be excepted from discharge under § 523 (a)(2), (a)(4), and (a)(6).

## Jurisdiction and Authority

Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1334. Although subject matter jurisdiction is proper in this Court, questions regarding the constitutional authority of an Article I bankruptcy judge must be addressed. Under *Stern v. Marshall,* the question of whether a bankruptcy judge may enter final judgment in a case depends on whether the cause of action stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process. 131 S.Ct. 2594, 2618 (2011).  However, *Stern* does not implicate this Court's authority to hear and finally determine whether a claim is excepted from a debtor's discharge pursuant to 11 U.S.C. § 523(a). *See Farooqi v. Carroll (In re Carroll),* 464, B.R. 293, 311 (Bankr. N.D. Tex. 2011); *Deitz v. Ford (In re Deitz),* 760 F.3d 1038, 1046 (9th Cir. 2014). *See also In re Airhart,* 473 B.R. 178, 181 (Bankr. S.D. Tex. 2012) (noting that the court has constitutional authority to enter a final order when the dispute is based upon an express provision of the Code and no state law is involved). Accordingly, this Bankruptcy Court has authority to fully adjudicate this lawsuit.

## Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Fed. R. Bankr. P. 7056 incorporates Rule 56 in adversary proceedings.

A party seeking summary judgment must demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) an absence of a genuine dispute of material fact. *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009); *Warfield v. Byron,* 436 F.3d 551, 557 (5th Cir. 2006). A genuine dispute of material fact is one that could affect the outcome of the action or allow a reasonable fact finder to find in favor of the non-moving party. *Royal v. CCC & R Tres Arboles, L.L.C.,* 736 F.3d 396, 400 (5th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

A court views the facts and evidence in the light most favorable to the non-moving party at all times. *City & Cnty. of S. F., Cal. v. Sheehan*, 135 S.Ct, 1765, 1769 (2015). Nevertheless, the Court is not obligated to search the record for the non-moving party's evidence. *Malacara v. Garber,* 353 F.3d 393, 405 (5th Cir. 2003). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record, showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support the fact.[1] Fed. R. Civ. P. 56(c)(1). The Court need consider only the cited materials, but it may consider other materials in the record. Fed. R. Civ. P. 56(c)(3). The Court should not weigh the evidence. A credibility determination may not be part of the summary judgment analysis. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). However, a party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. Fed. R. Civ. P. 56(c)(2). Moreover, the Court is not bound to

---

[1] If a party fails to support an assertion or to address another party's assertion as required by Rule 56(c), the Court may (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for the purposes of the motion; (3) grant summary judgment if, taking the undisputed facts into account, the movant is entitled to it; or (4) issue any other appropriate order. Fed. R. Civ. P. 56(e).

search the record for the non-moving party's evidence of material issues. *Am. Family Life Assur. Co. of Columbus v. Biles*, 714 F.3d 887, 896 (5th Cir. 2013).

"The moving party bears the burden of establishing that there are no genuine issues of material fact." *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship,* 520 F.3d 409, 412 (5th Cir. 2008). The evidentiary support needed to meet the initial summary judgment burden depends on whether the movant bears the ultimate burden of proof at trial.

If the movant bears the burden of proof on an issue, a successful motion must present evidence that would entitle the movant to judgment at trial. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 326 (1986). Upon an adequate showing, the burden shifts to the non-moving party to establish a genuine dispute of material fact. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 322-24. The non-moving party must cite to specific evidence demonstrating a genuine dispute. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324. The non-moving party must also "articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004). Even if the movant meets the initial burden, the motion should be granted only if the non-movant cannot show a genuine dispute of material fact. If the non-movant bears the burden of proof of an issue, the movant must show the absence of sufficient evidence to support an essential element of the non-movant's claim. *Celotex*, 477 U.S. at 325. Upon an adequate showing of insufficient evidence, the non-movant must respond with sufficient evidence to support the challenged element of its case. *Id.* at 324. The motion should be granted only if the nonmovant cannot produce evidence to support an essential element of its claim. *Condrey v. Suntrust Bank of Ga.*, 431 F.3d 191, 197 (5th Cir. 2005).

**Analysis**

In an adversary proceeding to determine whether a debt is dischargeable, the plaintiff bears the burden of proving the elements by a preponderance of the evidence. *Countrywide Home Loans, Inc. v. Cowin (In re Cowin)*, 492 B.R. 858, 905-06 (Bankr. S.D. Tex. 2013). "Intertwined with this burden is the basic principle of bankruptcy that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the Debtor may be afforded a fresh start." *Hudson v. Raggio & Raggio, Inc. (In re Hudson)*, 107 F.3d 355, 356 (5th Cir. 1997).

*Section 523(a)(6)*

The Court will first address whether Saden acted willfully and maliciously so as to except from discharge the damages resulting from harm done to Smith under § 523(a)(6). Section 523(a)(6) provides for the denial of the discharge of debts resulting from a debtor's willful and malicious conduct. In order for conduct to qualify as willful and malicious, the debtor must act with "either an objective substantial certainty of harm or a subjective motive to cause harm." *Williams v. IBEW Local 520 (In re Williams)*, 337 F.3d 504, 409 (5th Cir. 2003). Debts resulting from a debtor's negligence or recklessness are not subject to exception from discharge, but willful conversion of another's property does satisfy § 523(a)(6). *Kawaauhau v. Geiger*, 523 U.S. 57, 64 (1998); 4 Collier on Bankruptcy ¶ 523.12(4) (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

A bankruptcy court presented with a state court judgment as evidence in support of a § 523 exception may inquire into the true nature of the debt in order to make a dischargeability determination. *Brown v. Felsen*, 442 U.S. 127, 138 (1979). Smith's submission of the state court of appeals opinion and trial court judgment provided the Court with dispositive proof that

Saden's conduct was willful and malicious. *Carey Lumber Co. v. Bell*, 615 F.2d 370, 377 (5th Cir. 1980). Under Rule 56, Saden had the burden of providing the Court with evidence suggesting that a material fact issue exists that would make a dischargeability determination premature at this juncture. However, Saden's response to the motion did not dispute the willful and malicious conduct. (ECF No. 31 at 3-4). The substantive portion of Saden's response related to whether a fiduciary relationship existed between himself and Smith, an inquiry relevant under § 523(a)(4), but not (a)(6).

    *i.*    *Saden acted willfully and maliciously*

Smith cites several instances wherein Saden's conduct rose to the level of willful and malicious conduct:

- Admitting to creating a fraudulent check he used when establishing a direct deposit procedure in order to induce the bank to directly deposit funds properly payable to POS into Saden's personal bank account. (ECF No. 28-2 at 26-27).

- Creating a sole proprietorship styled Precision Payment Company and transferring POS accounts to PPC, thereby diverting revenue from POS. (ECF No. 28-3 at 4-5).

- Using his personal agent number on POS merchant contracts so that commissions paid on those contracts would be paid to him, not POS. (ECF No. 28-3 at 16-17).

- Selling POS assets and merchant accounts to third parties and depositing sales proceeds in his personal bank account. (ECF No. 28-2 at 39-43).

- Using POS money to pay undisclosed salaries, benefits, and personal expenses for himself and his family members. (ECF No. 28-3 at 74-84).

- Falsely representing to Smith that POS profits were being divided equally when actual profits were being split approximately 60-40. (ECF No. 28-2 at 9, 17, 30-33).

- Supplying Smith with false accounting records to hide his fraudulent conduct. (ECF No. 28-8 at 16-17).

Saden does not dispute Smith's allegations, and in many of the cited instances, admitted to engaging in the alleged conduct. Saden attempts to justify his conduct by arguing that Smith was not engaged in the operations of POS, and therefore did not deserve the benefit of his share of the profits. When asked about his alleged conduct at trial, Saden testified:

> Q: Did you think that's something that your business partner would want to know?
>
> A: If [Smith] wanted to participate and get to know things he could have spent a lot more time involved in the operation, including referring like kind businesses.
>
> Q: So, your position is then hey, if he had gotten more involved he would have caught this theft but shame on him for not getting more involved?
>
> A: He was secretary-treasurer and he certainly didn't have an idea of what was going on in the corporation.
>
> . . .
>
> Q: You're not telling the ladies and gentlemen of the jury that you told Mr. Smith you were skimming this money off the top, are you?
>
> A: I didn't tell Mr. Smith I was skimming off of the account.

(ECF No. 28-2 at 30-32). When presented with the question "do you find by clear and convincing evidence that the harm caused by [Saden's] conduct . . . resulted from malice?" the jury answered in the affirmative. (ECF No. 28-9 at 21). Saden's own admissions demonstrate a subjective motive to cause Smith injury. (ECF No. 28-2 at 32) (Q: "If you got [$]50 or [$]60 in one particular month you would then write a check over to POS . . . and say [$]25, right?" A: "They got what they deserved."); *In re Williams*, 337 F.3d 504, 508-09 (5th Cir. 2003). Based on the evidence presented to the Court by Smith, the Court finds that Saden acted with willfulness and maliciousness in his dealings with Smith and POS. Accordingly, any harm that resulted from Saden's willful and malicious conduct is excepted from discharge.

*ii.    Damages*

Mr. Shields testified at trial regarding POS's financial circumstances. He testified that while Smith was *actually* paid $856,334.00 by POS in commissions and director fees, he was entitled to an additional $941,907.00.[2] (ECF No. 28-6 at 3-5). The additional amount represented "the excess portion of the income that was either received by or directed to the benefit of Mr. Saden." (ECF No. 28-6 at 9). The jury awarded Smith $941,907.00 for breach of contract damages, consistent with Mr. Shield's testimony. Because Saden acted willfully and maliciously when he engaged in the conduct warranting the award for breach of contract, the entire award of $941,907.00 is excepted from discharge.

Additionally, the trial court awarded $590,173.27 for Smith's attorney's fees and $269,153.15 in prejudgment interest as well as post judgment interest at a rate of 5% from the date of the judgment until paid. If the primary debt is nondischargeable due to willful and malicious conduct, the attorney's fees and interest accompanying the damages are likewise nondischargeable. *Gober v. Terra+Corp. (In re Gober)*, 100 F.3d 1195, 1208 (5th Cir. 1996). Accordingly, the trial court's award for attorney's fees and prejudgment interest are also excepted from discharge. The $75,000.00 appellate award and post judgment interest at a rate of 5% from the date of the trial court's judgment is also excepted from discharge.

*Section 523 (a)(2) and (a)(4)*

At trial, the jury found that Saden had failed to comply with his fiduciary duties to Smith. Saden argues that he did not owe a fiduciary duty to Smith. (ECF NO. 31 at 2). Whether Saden owed a fiduciary duty to Smith is immaterial. He undoubtedly owed a fiduciary duty to POS, of which Smith is a 50% shareholder. The court of appeals determined that "the injury suffered by

---

[2] Mr. Shields calculated the total revenue of POS, divided it evenly in accordance with the 50-50 split contemplated by the POS formation documents, and subtracted the amount actually paid to Smith and the amount POS left undistributed to determine the amount payable to Smith.

the corporation is the injury suffered by Smith as 50% shareholder to the extent it inured to the other 50% shareholder's benefit." (ECF No. 31 at 38). The jury awarded Smith an additional $941,907.00 as equitable disgorgement of the profits Saden received while in breach of his fiduciary duties.

Absent fraud or defalcation, breach of fiduciary duty is not a statutory exception to discharge under § 523. At trial, no questions were submitted to the jury regarding fraud, defalcation or embezzlement and the court of appeals unequivocally reversed the portion of the trial court's judgment that held that "Saden committed acts of fraud, defalcation, an embezzlement while acting and serving in a fiduciary capacity . . . ." (*Id.* at 7). The court of appeals determined that Smith failed to plead the issue of whether Saden committed acts of fraud, defalcation, and embezzlement, and also failed to request a jury question relevant to support such a finding. (*Id.* at 53).

Because there was no finding of fraud or defalcation by the jury, collateral estoppel cannot be applied to bar the relitigation of the issue of whether Saden committed fraud or defalcation while serving in a fiduciary capacity to satisfy § 523(a)(4), or alternatively, committed actual fraud so as to satisfy (a)(2). Because the judgment against Saden was entered in Texas state court, we are to apply the Texas law of issue preclusion. *In re Pancake*, 106 F.3d 1242, 1243 (5th Cir. 1997). Texas law requires, among other things, that the fact sought to be litigated in the second action was fully and fairly litigated in the prior action. *In re Miller*, 156 F.3d 598 (5th Cir. 1998). Neither fraud nor defalcation was litigated in the state court trial. Therefore, the Court must determine whether a material issue of fact exists concerning Saden's alleged fraud or defalcation.

The Court recognizes that the evidence strongly suggests fraud on Saden's part. However, the evidence at this stage supporting a finding of fraud is not as substantial as the evidence supporting willfulness and maliciousness. In contrast to the jury's finding that Saden acted with malice, the jury made no finding of fraud or defalcation, and the court of appeals unambiguously reversed the trial court when it made such a finding. While the court of appeals reversal on the finding of fraud and defalcation is not preclusive vis-à-vis Smith because fraud was never pleaded, it nevertheless garners some degree of consideration from this Court. Finally, the general principle in bankruptcy that exceptions to discharge be strictly construed against a creditor and liberally construed in favor of a debtor colors the Court's analysis.

Based on the record at this stage, it is apparent that Smith suffered one injury as a result of Saden's conduct. The nondischargeability determination for Saden's willful and malicious conduct and its attendant interest and attorney's fees remediates the harm done to Smith. As the court of appeals stated, "[Smith] suffered one injury: he was derived of all the money he was due from POS because of the various faithless actions taken in violation of the parties' agreement and Saden's fiduciary duties." (ECF No. 31 at 47). Without the benefit of Smith's pleading fraud or defalcation and obtaining a jury finding to that end, the Court declines to make such a determination at this stage. A material issue of fact exists as to whether the debt Saden owes Smith was obtained through actual fraud or fraud or defalcation while serving in a fiduciary capacity. Accordingly, Smith's motion is denied as to the trial court's award for equitable disgorgement and the interest thereon.

## Conclusion

In total, $1,876,233.42 exclusive of post judgment interest is excepted from Saden's discharge. The Court will issue an Order consistent with this Memorandum Opinion. Not later

than March 21, 2016, Smith must file a notice (i) requesting entry of a final judgment excepting from discharge the sum of $1,876,233.42 plus interest at 5% from and after October 1, 2014; or (ii) requesting a trial on whether any additional amounts should be excepted from discharge.

SIGNED **March 7, 2016.**

_____
Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE